Filed 2/13/15  In re Raymond E. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Raymond E., a Person Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>Leanne E.,<br><br>  Defendant and Appellant. | A141195<br><br>(Humboldt County<br>Super. Ct. No. JV120040) |

## I.  INTRODUCTION

On January 9, 2014, we denied a petition filed by Leanne E. (Mother) seeking extraordinary writ review of a juvenile court order terminating Mother's reunification services with her son, Raymond E. (Raymond), and setting the matter for a Welfare and Institutions Code section 366.26 hearing.[1]  (*L.E. v. Superior Court* (Jan. 9, 2014, A139753) [nonpub. opn.].)  Mother now appeals from the juvenile court's order terminating her parental rights.  She asserts that the court erred when it found that she had not met her burden of establishing the beneficial relationship exception (§ 366.26, subd. (c)(1)(B)(i)), which overcomes the statutory presumption in favor of adoption.  Mother also argues that the court improperly denied Raymond's grandparents' section 388

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

1

petition and failed to consider the relative placement preference (§ 361.3) before terminating Mother's parental rights. We disagree and, accordingly, affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Raymond was detained on March 9, 2012, when he was almost five years old after Mother and Father[2] were unable to care for him because of their substance abuse and mental health issues.[3] Before Raymond was detained, there had been 10 social service referrals regarding Raymond between April 23, 2007, and March 9, 2012. Six of these referrals were assigned for investigation, beginning with a report of general neglect after Raymond tested positive for marijuana at birth. In another reported incident, on November 7, 2011, a mandated reporter contacted the Department "to report the general neglect of [Raymond] by his parents. Raymond's maternal uncle reportedly disciplined him inappropriately which resulted in the mother and the uncle getting into a physical altercation. The parents were described as low functioning due to extreme mental health issues. The minor was seen and was dirty, smelled of feces, and had food crusted to his face. The father appeared agitated and spoke unintelligibly at times. The father smelled of marijuana. The family had limited resources. The referral was assigned for investigation and remains open." The Department social worker who was involved in placing Raymond in foster care reported that family members had heard "Raymond talk about killing himself. They feel this may be because of overhearing his parents making similar statements."

At the time he was detained, Raymond was living with his parents in a tent on the maternal grandparents' property in Arcata.

Raymond was placed in a local foster home and the court ordered supervised visitation for the parents twice a week for two hours.

---

[2] Father is not a party to this proceeding.

[3] The pertinent facts leading up to the juvenile court's order terminating Mother's reunification services are set forth in our earlier opinion denying Mother's writ petition. Some, but not all, of these facts are summarized below.

At the six-month review hearing, Mother argued that she had not been provided with reasonable family reunification services because she had not been provided with a psychological evaluation. The court agreed based on the fact that a psychiatric evaluation had yet to be performed.

During this period of time, the Department had referred Mother to several programs and Mother was scheduled to start an "Early Recovery Group" in August. At the same time, Mother drug tested positive for marijuana. She then did not attend any groups for two months except on one occasion when she brought Father with her and said she could not leave him alone. After that, there was no further contact on Mother's part with these services.

In addition to struggling with mental health and substance abuse issues, Mother did not have a stable living environment. She and Father were living for a time with Father's sister, but then were forced to move back to Eureka where they camped at sites and with friends. They also stayed intermittently at Mother's parents' house. According to the Department "[t]he maternal grandparents' residence is not appropriate for Raymond to be returned home to. There is often conflict and discord between the parents and grandparents and the parents are often 'kicked out' of the residence. Furthermore the parents reside in a tent on the backside of the house."

With regard to their parenting, despite a referral to a parenting class at the Manila Community Center, the parents did not attend this class. Referred to a second parenting class, the parents attended and participated, although they missed class or left early on several occasions. In addition, the parents had missed about half their visits. During those visits, "the parents struggle[d] to maintain their behavior" and Mother was the parent who most significantly interacted with Raymond. Mother also had inappropriate conversations with Raymond, which caused him to "wet his pants, become aggressive, cry, and withdraw[]." In addition, Mother had been arrested twice outside the location of the supervised visits. According to the Department, "The first time, on or about 7/12/2012, she was hitting her head against a pole and screaming. She was arrested for [being] drunk in public and was taken to Sempervirens. The second incident occurred on

8/6/2012. She was arrested for domestic abuse against [Father]. Law enforcement believed both parents to be under the influence of a control[led] substance, most likely methamphetamines."

On December 11, 2012, Mother's parents sought to be appointed Raymond's de facto parents pursuant to California Rules of Court, rule 5.502(10). In their petition they stated that they "spent about 8-10 hours daily with" Raymond. Mother and Father supported this request; the Department opposed it. At the hearing on this request, county counsel pointed out that Raymond was detained while living with Mother at the home of the grandparents, "which indicates that they did not take steps to protect the child when the child was originally detained." By order filed April 4, 2013, the court denied the request, finding that "while [grandparents] were active and caring grandparents for the minor, the nature of the relationship did not give rise to de facto parent status." There was no appeal from this order.

On January 7 and 21, 2013, Mother was evaluated by Dr. Andrew Renouf. Renouf diagnosed Mother as follows: "[Mother] exhibits a chronic and low-level depression that periodically will worsen to a major depression. Her level of depression at the time of assessment was mild but present. The diagnosis of PTSD indicates that she suffered a trauma that she continues to experience through intrusive memories, flashbacks, and nightmares. She attempts to avoid reminders of the trauma because of the distress associated, and is unusually vigilant for potential threats in her environment. The diagnosis of Cannabis Dependence indicates a pervasive pattern of excessive cannabis use with a psychological dependence on the substance." In sum, Mother "exhibits serious symptoms of anxiety, trauma, and depression, and is seriously impaired in her ability to function socially, as a parent, and vocationally."

Mother and Father subsequently separated and by June 4, 2013, Mother was again living with her parents. Mother began to see a drug counselor and was planning to begin a dual recovery program as well as see a psychiatrist to monitor her medications.

At the 12-month permanency planning hearing stage, the Department recommended that reunification services be terminated. The Department recognized that

4

"[t]he family has made many changes over the past three months. However, Raymond was removed in March 2012 and the family has not been able to engage in their case plan until the parents separated in April 2013. At the writing of this report, the parents do not have housing, their mental health and substance abuse is not stable although they are beginning to engage in services, and visits are only now becoming more focused and consistent. Given the parents' long reported history of AOD abuse and Mental Health issues a 3-4 month period of relative stability is not enough time to find substantial probability of return by the next review. This is especially true in light of the fact that Raymond was removed one and a half years ago."

At the section 366.26 contested hearing, Mother testified that she lived on her parents' property with her boyfriend, Wayne, in a tent. She believed she would eventually be able to move into the house and Raymond would live in the same room with her. She was looking for a job. Mother stated that she believed Raymond was more important than Wayne. There was no domestic violence in the relationship and it was positive. Wayne was unemployed and did not support her financially. She understood that he had been convicted of several crimes, including domestic violence. She believed her visits with Raymond went well.

At the conclusion of the hearing, the juvenile court made a number of findings. Of relevance to this matter, the court found that "while the parents have done quite a bit to individually stabilize themselves, that's really the jumping off or starting point to see whether or not there's—what improvements could potentially be made. And the analysis is is there a substantial probability that the child would be returned. And just arguably using the December date, the Court finds there is not a substantial probability. Frankly, there isn't any real probability that in three-month's time all the problems that led to the Court's becoming involved would be to the point that the child could be returned in the matter. And I think that's too bad. [¶] I am happy that the parents are improving their individual lives and have stabilized, but it doesn't relate directly necessarily to the care of the child that, like I said before, the jumping off point."

5

The court then terminated reunification services and set a section 366.26 hearing. This order, as we have noted, was upheld in our earlier opinion regarding Mother's petition for extraordinary writ review.

On October 18, 2013, the court granted Raymond's foster parents de facto parent status and also designated them prospective adoptive parents. On that same date, Raymond's social worker sought a change in the court's previously ordered supervised visitation schedule for the parents from twice a week for two hours to once a week for two hours. This request was based on the fact that "[t]he high frequency of visits are confusing to Raymond. He has been told he will not live with his parents again, but he continues to have frequent visits." In addition, "[Raymond's] behavior at school had deteriorated and the staff at the school has expressed concerns for his well-being." On November 6, 2013, the court found that the previous visitation schedule was not in Raymond's best interests and decreased Mother's visits to a minimum of one weekly visit of no less than two hours. The court ordered that the grandparents also have contact with Raymond.

On October 28, 2013, the grandparents filed a section 388 petition asking the court to "[s]et a hearing to determine whether the Department [was] investigating placement or visitation with the grandparents . . . [and] order visitation to the grandparents." The grandparents alleged that "[t]he minor has a bond with the maternal relatives. They have been having visitation with the minor consistently, with relatively short notice, when the parents cannot attend the visit. There have not been any problems with these visits and it is an important part of the minor's life. The Department has not adequately explored further visitation with the grandparents, whether supervised or not." The court denied this petition on December 30, 2013.

In advance of the section 366.26 hearing, the Department informed the court that Raymond was on track developmentally, and "very much at home" with his foster parents, who "are dedicated to providing a permanent home for Raymond." The caregivers were "aware of [Raymond's] physical, emotional, education and developmental needs. The caregivers have demonstrated their willingness and ability to

6

meet his needs . . . [and] are committed to providing permanency in the form of adoption for Raymond." Although Raymond "clearly loves his parents and grandparents and enjoys spending time with them, the instability has been unsettling for him." The Department recommended that Mother and Father's parental rights be terminated and that adoption by his current foster parents be ordered as Raymond's permanent plan.

The Court-Appointed Special Advocate (CASA) agreed with the Department's recommendation regarding the termination of parental rights and also recommended that the current foster parents be granted the status of prospective adoptive parents. The CASA identified Raymond's "current foster parents as very important adults in his life." Raymond referred to them as "Mom" and "Dad" and kissed and hugged them when he left them and returned to them. He called his foster siblings his "brother and sister." Academically, Raymond was doing well in school although he had recently had a number of outbursts in class and he had also hit other children during recess. In addition, the CASA learned that Raymond had been having "an increased number of negative behaviors on visitation days."

Raymond also continued to visit regularly with his birth parents and his maternal grandparents. The service logs of Mother's supervised visits with Raymond chronicled loving visits in which he generally had fun, and played well with Mother, who generally behaved appropriately with him. He looked forward to seeing her and on one occasion asked why he couldn't see her more and told her she was "the best mother ever."

The Department acknowledged that Mother wanted her parents to adopt Raymond and that her parents were interested in adopting him. The Department, however, was concerned that "the grandparents will not be able to adequately protect him from his parent's behavior since they have previously demonstrated that they are unable to have firm boundaries with the parents. . . ." Noting that there was no approved adoption homestudy for the grandparents, the Department also reported that "adoption with the grandparents would likely not be approved since the mother stated on December 16, 2013 that she is still living with her parents. . . ." In contrast, Raymond's foster parents

7

"provid[ed] healthy boundaries between the parents as well as providing structure in the home."

On February 26, 2014, the court held a section 366.26 hearing. When asked about the recent escalation in Raymond's aggressive behavior, the social worker observed that Raymond had "increased contact [with Mother] in the month of December. Mother had been discussing being pregnant again. She was encouraging [Raymond] to put his hand on her stomach. And basically, all I know further is that—that around that time is when his behavior started to deteriorate." A social worker who was familiar with Raymond testified at the hearing that his foster mother had informed him that Raymond's "behaviors have deescalated substantially since visitation was suspended." He had also learned from the principal of his school that Raymond "has been completely stable since visitation was suspended . . . ."

At the conclusion of the hearing, the court found that Mother had not shown the extraordinary circumstances necessary to invoke the beneficial relationship standard in which "[t]he parent must show the parent-child bond is a substantial, positive, emotional attachment such that the child will be greatly harmed if the parental rights will be terminated." The court also emphasized the quality of Raymond's relationship with his foster family, in which he interacted with them as a "family unit." The court pointed out that Raymond "appears very content when playing with his foster siblings" and referred to them as mom, dad, brother and sister.

The court expressed its understanding that this was an "[a]wful decision, because he does love you, and he does love his grandparents, and I have no doubt about that." The court also observed, however, that ultimately "[t]he essence to [Raymond] is where do I find peace and permanency." Accordingly, the court terminated Mother and Father's parental rights.

A notice of appeal of this order was filed on February 27, 2014.[4]

---

[4] Father did not appeal.

8

## III. DISCUSSION

**A.    *Beneficial Relationship Exception***

Mother argues that she met her burden of showing a continuing beneficial relationship with Raymond under section 366.26, subdivision (c)(1)(B)(i) and the court therefore erred in terminating parental rights.  We disagree.

At the section 366.26 hearing, the court must select and implement a permanent plan for the dependent child.  "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 573 (*Autumn H*.).)  Section 366.26, subdivision (c)(1), provides that "[i]f the court determines . . . it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption."  An exception is made if the court finds "a compelling reason for determining that termination would be detrimental to the child [because] . . . [¶] (i) [t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); *In re Clifton B.* (2000) 81 Cal.App.4th 415, 424.)  It is the parent's burden to demonstrate the applicability of this exception. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

"The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.]  No matter how loving and frequent the contact, and notwithstanding  the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.]  The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences.  Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation.]  Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)

9

The beneficial relationship exception is "examined on a case-by-case basis," (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166) taking into account " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs . . . .' " (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1206.)

We will affirm the trial court's order if substantial evidence supports its conclusion that Raymond's need for a permanent, stable home outweighed any benefit to him from a continued legal relationship with Mother.[5] "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*Autumn H., supra,* 27 Cal.App.4th at p. 576.)

Viewing the evidence in favor of the order, we conclude that substantial evidence supports the court's decision that Mother failed to meet her burden of showing the beneficial relationship exception applies in this case. Raymond is currently seven years old.[6] The first five years of Raymond's life, when he lived with Mother and Father, were beset with difficulty. Before Raymond was finally detained, the Department received 10 referrals—beginning with Mother testing positive for marijuana at birth, several for "general neglect," and one involving the inappropriate discipline of Raymond by an uncle. Mother and father both had significant mental health issues and Raymond was, when contact was made with Department workers, dirty and smelled of feces. It is evident from the record that the beginning of Raymond's life in the care of Mother was in many ways detrimental to him.

---

[5] Although courts have applied different standards of review to this issue, in this case, we would affirm under either the substantial evidence or abuse of discretion standard of review. (See *In re G.B., supra,* 227 Cal.App.4th at p. 1166, fn. 7.)

[6] Raymond was born in April 2007. He was detained in March 2012, placed in a temporary foster home for a month, then lived with his paternal aunt for less than two months and, since June 11, 2012, has lived with foster parents.

The record also supports the juvenile court's determination that Raymond's interactions with Mother often had negative effects on him. Early in the dependency process, Mother had "inappropriate conversations" with him that caused him to wet his pants, become aggressive and cry. Prior to the February 26, 2014, section 366.26 hearing, Raymond acted out at school by hitting other children and, in general, had an increased number of negative behaviors on visitation days. This behavior coincided with Mother's conversations with Raymond in December 2013 about her desire to increase their visits. At the February 26, 2014, section 366.26 hearing, a social worker who was familiar with Raymond described the recent escalation in Raymond's aggressive behavior, and observed that this may have stemmed from December visits in which Mother discussed her pregnancy with Raymond and encouraged him to put his hand on her stomach. After visitation was suspended, Raymond's "behaviors . . . deescalated substantially." Raymond's school behavior was also "completely stable since visitation was suspended . . . ."

At the time of the section 366.26 hearing, Raymond was securely bonded with his foster family, with whom he had been living for nearly two years. He got on well with them, and looked to his foster parents as his caregivers. Raymond referred to them as "Mom" and "Dad." Improvements in his behavior were attributed by social workers to his relationship with his foster parents.

The juvenile court acknowledged the loving bond Mother shared with Raymond, who called her "mom," enjoyed their visits, and talked about her at school. During supervised visits Mother was attentive to him, engaged him in activities on these visits and appropriately disciplined him and comforted him. Raymond enjoyed seeing her and asked Mother why he could not see her more and why their visits weren't longer. On one occasion, Raymond had a "meltdown" and told Mother he did not want to end the visit.

Evidence of loving and enjoyable supervised visits, however, are not enough to establish that "mother's relationship with her children promoted their well-being to such an extent that it outweighed the well-being the children would gain in a permanent home with adoptive parents." (*In re G.B., supra,* 227 Cal.App.4th at p. 1166.) In light of the

11

evidence that Raymond's contacts with Mother were problematic and often resulted in escalating negative behavior, and his relationship with his foster family so clearly gave him much-needed stability, substantial evidence supports the juvenile court's finding that Raymond's need for stability outweighed any benefit to him from a continuing relationship with Mother.

**B.      *Grandparents' Section 388 Petition***

Mother also argues that the court erred in its December 30, 2013, order denying grandparents' section 388 petition seeking a "change of placement or . . . for the Court to direct a home study be done of the maternal grandparents' home."

The first issue we must decide is whether we have jurisdiction to review this order. Mother filed a notice of appeal on February 27, 2014, seeking review only of the court's "2/26/14; order terminating parental rights per W.I.C. 366.26." She did not make any reference to the court's December 30, 2013, order denying grandparents' section 388 petition, an order that was never appealed.

In general, " '*all* postdispositional orders in juvenile dependency matters are directly appealable *without limitation*, except for post-1994 orders setting a section 366.26 hearing.' [Citation.]" (*In re Daniel K.* (1998) 61 Cal.App.4th 661, 668.) "Appellate jurisdiction to review an appealable order is dependent upon a timely notice of appeal." (*In re Elizabeth G.* (1988) 205 Cal.App.3d 1327, 1331.) "An appeal from the most recent order entered in a dependency matter may not challenge prior orders, for which the statutory time for filing an appeal has passed." (*In re Elizabeth M.* (1991) 232 Cal.App.3d 553, 563.) Mother, therefore, appears to have waived review of the court's December 30, 2013, order.

Mother argues, however that we may liberally construe the notice of appeal to include the December 30, 2013, order. In *In re Madison W.* (2006) 141 Cal.App.4th 1447, 1450, the mother appealed from a section 366.26 order terminating her parental rights. She failed, however, to appeal from the juvenile court's order, made just three days earlier, denying her section 388 petition seeking further reunification services. In that situation, the court liberally construed the notice of appeal to include the denial of

Mother's section 388 petition. The court observed that "[w]e frequently receive notices of appeal challenging the termination of a parent's rights and nothing more despite the fact that on or before the same day as the termination order but within 60 days of when the notice of appeal was filed (Cal. Rules of Court, rule 2), the court also denied the parent's eleventh-hour section 388 petition. When counsel brings the issue to our attention during record preparation or before briefing occurs, we routinely deem the notice of appeal amended to include the additional ruling." Among other reasons the court gave for this liberal construction of the parent's notice of appeal was its recognition that these "eleventh-hour" petitions would be otherwise appealable if the trial court had denied them within the 60-day window for filing an appeal.

Here, the grandparents' petition, which was filed on October 28, 2013, was not filed in conjunction with the February 26, 2014, order terminating Mother's parental rights, nor did it involve a parent's effort to seek further reunification services as in *In re Madison W.* It is, however, the case that the court's December 30, 2013, order would have been appealable at the time the February 27, 2014, notice of appeal was filed. In addition, as Mother points out, the notice of appeal does refer to the December 30, 2013, order when it refers to the hearing dates related to the termination of parental rights. In these circumstances, therefore, we will liberally construe the notice of appeal to include the court's December 30, 2013, order.

The Department also argues that Mother does not have standing to challenge the court's denial of the grandparents' section 388 petition. Mother's parental rights, however, had not yet been terminated and, therefore, she had an interest in Raymond's placement, which gave her standing to appeal this order. (*In re H.G.* (2006) 146 Cal.App.4th 1, 9-10 [prior to termination of parental rights, parents have standing to challenge court order regarding placement of child with grandparents].)

We turn now to the merits of Mother's argument, which is essentially that the trial court abused its discretion in not reconsidering its original decision that the grandparents were an inappropriate placement for Raymond, a decision based largely on the fact that the grandparents continued to allow the parents to live on their property and could not

prevent them from interacting with Raymond. "Under section 388, the petitioner must show by a preponderance of the evidence either changed circumstances or new evidence and that the proposed modification is in the best interests of the child. (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.) The grant or denial of a section 388 petition is committed to the sound discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is clearly established. [Citation.] A trial court exceeds the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. [Citation.]" (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.)

In their section 388 petition, the grandparents asked the court to set a hearing to determine whether the Department was investigating placement or visitation with the grandparents. The grandparents alleged that "[t]he minor has a bond with the maternal relatives." They also pointed out that they "have been having visitation with the minor consistently, with relatively short notice, when the parents cannot attend the visit. There have not been any problems with these visits and it is an important part of the minor's life."

On December 30, 2013, the court heard the grandparents' section 388 petition, which the Department and the CASA opposed. Grandmother testified that she understood the Department believed there was a risk, based on her past behavior, that she would not be able to protect Raymond from his Mother and Father. She admitted that Mother, who was homeless, continued to live in a tent on grandparents' property and would come into grandparents' house for meals and use the bathroom. Grandmother explained that although she had earlier told the Department that she would not allow Mother to live with her again, Mother continued to do so because "it's kind of hard to not have her on the property when she calls you up and she's crying because she has no place to stay, she doesn't have any food. I mean, she's my daughter. I'm supposed to take care of her . . . even though she is an adult and able to do that on her own." Grandmother explained that she couldn't afford to pay to put Mother up elsewhere. However, Grandmother testified that if she (grandmother) had custody of Raymond, Mother would "just have to find someplace else to be." Grandmother did not think she would be able to

14

help Mother much in finding a place and she didn't know how that would work out. She did not want to have to choose between her daughter and her grandson. In fact, her preference was for them to be together but if that wasn't possible, then she would like to have her grandson. Grandmother believed that Mother was "a lot stabler now. She's not on the drugs that she was on. And you can talk to her and have a normal conversation, without her screaming at you and just being . . . kind of uncontrollable." With regard to visiting Raymond, Grandmother stated that when Father could not make visits, then she would go. In his visits with his cousins, Raymond got along well and they had a "good time." Grandmother did not believe she would have any difficulty establishing boundaries with Raymond's father.

Grandmother also testified about a visit in March when she allowed Mother to attend an event with Raymond which had not been authorized by the Department. Grandmother explained that she had not realized the visit was not permissible under Mother's visitation rules.

Mother testified that she would accept Grandmother's decision to ask her to leave the property if Grandmother had custody of Raymond. Mother was willing to stay away from her child because "I really want some contact with my kid and his family. And if that means I got to stay out of the picture, I'll do anything to—just so that they can see him." She had plans for living with her boyfriend, who was employed and financially supporting her.

The court denied the grandparents' section 388 request for a "change in placement or . . . for the Court to direct a home study be done of the maternal grandparents' home." Although it was clear to the court "that the maternal grandparents love their daughter very much and love their grandson very much," the court found that there was no "significant or any change of circumstance since the last time this issue was addressed. And I don't think that it's in the child's best interests . . . aside from the fact that, you know, if the child is around people that love them, they generally do well. [¶] But there is all indications that the child has stabilized in the current placement and that that placement needs to be looked at, dealt with in its entirety before any—before there would

15

be a change of circumstance that would be key in to looking at relative placement again." The court noted with approval the current caregiver's practice of going "out of her way to maintain positive relationships with . . . family members," which the court believed "does go to Raymond's long-term best interests."

The court did not abuse its discretion in denying the grandparents' section 388 petition. At the time of the hearing, the grandparents had not addressed the Department's concern that Mother continued to live on the property and had access to her parents' house. It was this concern that led to the Department's initial recommendation against placing Raymond with grandparents. Beyond grandmother and Mother's assurances that if Raymond were placed with his grandparents, Mother would no longer live on the property, the fact that this had not taken place gave rise to a reasonable inference that it would not occur in the future. Meanwhile, Raymond had entered into a positive, stable placement with foster parents who wanted to adopt him. Given that the grandparents failed to show any change in circumstances and Raymond's strong interest in continuing in his placement, we conclude that the court did not abuse its discretion in denying the petition.

## C. *Relative Placement Preference (§ 361.3)*

Mother argues that the court abused its discretion when, at the section 366.26 hearing, it did not give preferential consideration to grandparents' request under section 361.3 that Raymond be placed with them. We disagree.

The relative placement preference set out in section 361.3, subdivision (a) provides that "[i]n any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . . In determining whether placement with a relative is appropriate, the county social worker and court shall consider, but shall not be limited to, consideration of . . . [t]he best interest of the child, including special physical, psychological, educational, medical, or emotional needs." (§ 361.3, subd. (a)(1).) "The correct application of the relative placement preference places the relative 'at the head of the line when the court is determining which

placement is in the child's best interests.' [Citation.]" (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033.)

Although it is unsettled whether the relative placement preference is applicable after the termination of reunification services (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319-320), the grandparents also requested placement when Raymond was detained, and this placement was consistently considered and rejected. For example, when Raymond was detained, the Department noted that the maternal grandparents were a potential relative placement but were not appropriate because Mother and Father continued to live on their property. At the detention hearing, the court found that the grandparents' "suitability is not determined at this time." On April 4, 2012, after a short stay in foster care, Raymond was moved to his paternal aunt's home. He lived there for two months, but his behavioral difficulties led to his aunt's request that he be removed. At that time, he was placed with his current foster family. On November 6, 2012, the Department noted in its status review report that Raymond's maternal grandparents "continue to request placement of Raymond." However, as it had when Raymond was detained, the Department did not believe the grandparents "are appropriate at this time as they continue to allow the parents to reside in their home even after stating they would never take them back in."

As previously noted, in its consideration of the grandparents' section 388 petition, the court did not abuse its discretion in concluding that placing Raymond with his grandparents was not appropriate. (*In re R.T.* (2015) 232 Cal.App.4th 1284 [applying abuse of discretion standard of review to issue of denial of section 388 petition seeking relative placement].) The court's decision was based on the fact that Mother was living with the grandparents and grandparents were unlikely to keep Mother off the property. Essentially, placing Raymond with grandparents was tantamount to placing him with Mother—a placement the juvenile court concluded was clearly not in Raymond's best interests. In reaching the same conclusion at the section 366.26 hearing, the court similarly did not abuse its discretion.

In any event, even if the court did err, any such error was not prejudicial. As the court points out in *In re Joseph T., Jr.* (2008) 163 Cal.App.4th 787, 798, when the record shows "compelling reasons" not to place a child with a family member, any error in applying the relative placement preference is harmless. Here, as we have described, "the reasons for denying placement are clear from the evidence and discussion at the hearing and support the court's decision." (*Ibid*.) Therefore, it was not reasonably probable that a more favorable decision would have been reached in the absence of such error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

After briefing was concluded, Mother brought to our attention *In re R.T., supra,* 232 Cal.App.4th 1284. In that case, after R.T. was removed from his parents' custody, the Agency ignored the parents' requests made that same day that he be placed with either of two aunts identified immediately by father. The court found error, and held that this error was not harmless because the child might well have been placed with these relatives. This case is not helpful to Mother, however. Most basically, here, in contrast to the relatives in *In re R.T.,* Raymond's grandparents were not an appropriate placement in light of the fact that Mother continued to live on their property. Thus, even if there was error, any such error was harmless.

## IV. DISPOSITION

The order appealed from is affirmed.

_____
Miller, J.

We concur:

_____
Richman, Acting P.J.

_____
Stewart, J.

18